IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| BRIDGETT ANNE GLENN, | ) | Case No. 3:21-cv-358 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | **MEMORANDUM OPINION AND** |
| | ) | **ORDER**[1] |
| Defendant. | ) | |

Plaintiff, Bridgett Anne Glenn, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for supplemental security income ("SSI") under title XVI of the Social Security Act.  Glenn challenges the Administrative Law Judge's ("ALJ") negative findings, contending that the ALJ failed to adequately explain his reasons for finding unpersuasive the opinion of her treating physician, Kim E. Knight, MD.  But because any error in the ALJ's explanation of how he considered Dr. Knight's opinion was harmless, the Commissioner's final decision denying Glenn's application for SSI must be affirmed.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and the parties consented to my jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73.  ECF Doc. 12.

## I.  Procedural History

On January 4, 2019,[2] Glenn reapplied for SSI.[3]  (Tr. 232).[4]  Glenn alleged that she became disabled on December 14, 2017 due to: "1. loss of vision; 2. vitamin d deficiency; 3. c[a]lcific tendonitis; 4. type 2 diabetes; 5. hypertension; 6. osteoarthritis; 7. sleeping disorder; 8. allergic rhinitis; 9. depression/anxiety; 10. degenerative disc disease; 11. fatty liver disease; 12. hypothyroidism; 13. impi[n]gement syndrome; 14. trochanteric[] bursitis lef[t] hip; [and] 15. bipolar."  (Tr. 232, 259).  The Social Security Administration denied Glenn's application initially and upon reconsideration.  (Tr. 142-53, 155-66).  Glenn requested an administrative hearing.  (Tr. 182).

ALJ Paul Sher heard Glenn's case on May 20, 2020 and denied her claim in a June 18, 2020 decision.  (Tr. 15-32, 63-117).  In doing so, the ALJ determined that Glenn had the residual functional capacity ("RFC") to perform light work except:

> [N]o stooping greater than ninety (90) degrees.  She can occasionally crouch, never crawl and never climb ladders, ropes, or scaffolds.  She can have no exposure to workplace hazards such as dangerous machinery and unprotected heights, frequently handle and finger.  [Glenn] can understand, remember, and carry out simple tasks where the pace of productivity is not dictated by an external source over which the individual has no control, make judgments on simple work, and respond appropriately to usual work situations and changes in a routine work setting that are repetitive from day to day with few and expected changes.  She can respond appropriately to occasional contact with supervisors, no contact with the general public, and rare (meaning less than occasional but not completely precluded) contact with coworkers where there is no working in team or tandem with coworkers.

---

[2] There is a disparity between the date reflected on Glenn's SSI application (February 5, 2019) and the administrative decisions in the record (January 4, 2019).  Because both parties agree that Glenn's SSI application was filed on January 4, 2019 and the difference in date is immaterial, the court assumes January 4, 2019 to be the date of filing.

[3] Glenn previously filed applications for disability insurance benefits and SSI on November 27, 2015, claiming a disability onset date of November 15, 2014.  Those applications were denied after ALJ review on December 13, 2017.  Neither party disputes that the period of adjudication in this action is between January 4, 2019 and the date of the ALJ's decision.

[4] The administrative transcript appears in ECF Doc. 13.

(Tr. 22).

Based on vocational expert testimony that an individual with Glenn's age, experience, and RFC could perform work as a garment sorter, classifier, and a folder, the ALJ determined that Glenn was not disabled.  (Tr. 31).  On December 10, 2020, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3).  On February 13, 2021, Glenn filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Glenn was born on June 5, 1976 and was 41 years old on the alleged onset date.  (Tr. 142, 232).  She graduated from high school in 1996, at which she attended special education courses and completed a course on early childhood development.  (Tr. 44, 79, 260).  Glenn previously worked as a cook, but the ALJ determined she had no past relevant work.  (Tr. 30-31, 260).

### B.    Relevant Medical Evidence

Glenn focuses her challenge upon the ALJ's consideration of the opinion evidence regarding her physical impairments at Step Four of the sequential evaluation; thus, only a summary of the medical and opinion evidence relating to her physical impairments is provided.  *See* ECF Doc. 16 at 13-17; ECF Doc. 18 at 3-4.

As the ALJ's decision noted, the only period under adjudication was the period between January 4, 2019 and the date of the ALJ's decision.  (Tr. 24).  The ALJ noted that evidence of Glenn's condition before January 4, 2019 "does not provide pertinent information regarding [Glenn's] residual functional capacity as of January 4, 2019."  *Id.*  Nevertheless, because the ALJ did summarize portions of that earlier evidence, the court likewise does so here.

3

On August 7, 2017, Glenn visited Kim E. Knight, MD, reporting joint pain, back pain, difficulty moving, fatigue, stiffness, arthritis, loss of strength, and muscle aches.  (Tr. 869-70).  Glenn reported difficulty sitting still and a need to stand due to pain after sitting.  (Tr. 869).  And Glenn reported "a lot of pain" in her left hip, on which she had received a bursa injection and appeared to be flaring.  *Id.*  On physical examination, Glenn appeared to be in moderate pain/distress and had: (i) crepitus in the right shoulder with poor abduction and extension; (ii) spasms in the lower back with a straight leg raise at 30 degrees and decreased but intact reflexes; (iii) diffuse arthritis with crepitus in the knees; (iv) left trochanteric bursa; (v) absent left bicep reflexes; and (vi) no sensation in her feet.  (Tr. 871-72).  Dr. Knight diagnosed Glenn with hypothyroidism and trochanteric bursitis of the left hip. (Tr. 872).  Dr. Knight administered a bursa Kenalog injection.  *Id.*

On September 6, 2017, Glenn reported to Dr. Knight fatigue, weakness, and joint pain. (Tr. 873-74).  Glenn reported both some hip improvement and no relief from her bursa shot, as well as swelling in her left knee following a bump.  (Tr. 873).  She also reported that after trying physical therapy, her hip pain returned.  (Tr. 877).  Glenn's physical examination results were similar to her previous visit, except that Dr. Knight did not assess Glenn's foot sensation.  (Tr. 874-75).  Dr. Knight referred Glenn to an orthopedist and x-ray examination.  (Tr. 877).

On September 20, 2017, Glenn visited The Bellevue Hospital's emergency department with new onset of low back pain in her lower thoracic and mid-lumbar region with spasms.  (Tr. 848).  On physical examination, Glenn had unremarkable results, except she flinched to touch, reported pain with movement, and stated that everything hurt to light touch.  (Tr. 853-56).  The attending physician stated that Glenn's symptoms appeared "mostly psychosomatic."  (Tr. 854).

Glenn was discharged in stable condition with a diagnosis of low back muscle spasms and exacerbation of chronic back pain.  (Tr. 855, 858, 861).

On September 22, 2017, Glenn returned to The Bellevue Hospital, reporting continued low back pain, which she rated at 10/10 in severity.  (Tr. 833).  On physical examination, Glenn had unremarkable results except paraspinal lumbar soft tissue tenderness.  (Tr. 838-40).  Glenn was diagnosed with acute exacerbation of chronic low back pain and lumbar paraspinal soft tissue tenderness.  (Tr. 842-43, 847).  Glenn was discharged the same day with pain medication. (Tr. 846).

On October 6, 2017, Glenn returned to Dr. Knight, informing Dr. Knight of her hospital visits and reporting that she was waiting on an orthopedist.  (Tr. 878).  Glenn also reported fatigue, weakness, joint pain and swelling, back pain, stiffness, arthritis, and loss of strength. (Tr. 879).  On physical examination, Glenn had results similar to her August 7, 2017 visit, including absent sensation in her feet.  (Tr. 879-81).  Dr. Knight diagnosed Glenn with type 2 diabetes with diabetic polyneuropathy.  (Tr. 881-82).

On October 18, 2017, Glenn reported to Dr. Knight with "unbearable" right shoulder pain after bumping it the night before.  (Tr. 883).  Glenn stated that she had not been able to use her shoulder for the previous six days.  *Id.*  Glenn also reported fatigue, weakness, joint pain and swelling, back pain, stiffness, loss of strength, and muscle aches.  (Tr. 884).  On physical examination, Glenn had results similar to her previous visit except that Dr. Knight did not assess her foot touch sensation and Glenn also had right shoulder tenderness, inability to extend or abduct because of pain, and inability to hold her arm up.  (Tr. 884-85).  X-ray examination was negative for acute fracture but noted that she had elevated calcific density, "favor[ing] calcific tendinitis."  (Tr. 831).  Dr. Knight diagnosed Glenn with right shoulder pain, calcific tendinitis of

the right shoulder, and impingement syndrome of the right shoulder.  (Tr. 885-86).  Dr. Knight ordered x-ray examination.  (Tr. 886).

On November 9, 2017, Glenn visited Kevin A. Miller, PT, for a physical therapy evaluation regarding her right shoulder pain.  (Tr. 821).  Glenn reported burning pain between 5 and 8 in severity.  (Tr. 819).  On physical examination, Physical Therapist Miller observed muscle atrophy and swelling in the right acromioclavicular joint.  *Id.*  Glenn also had diminished range of motion, impingement, and limited functional reach.  (Tr. 819-20).  Physical Therapist Miller stated, however, that Glenn's clinical presentation was stable and her rehabilitation potential was good.  (Tr. 820).

On November 10, 2017, Glenn returned to Dr. Knight, reporting arthritis pain and fatigue.  (Tr. 887).  Glenn's physical examination results were similar to those on her October 18, 2017 visit, except she additionally had absent touch sensation in her feet and diminished pedal pulse sensation.  (Tr. 888).  And on December 11, 2017, Glenn presented to Dr. Knight with fatigue; weakness; malaise; joint pain and swelling; morning joint stiffness; muscle cramps; back, neck, knee, and shoulder pain; and arthritis.  (Tr. 891-92).  On physical examination, Glenn appeared in moderate pain/distress, had diffuse arthritis with antalgic gait and "assist with walking", and had impetigo in her right shin.  (Tr. 893).

On December 21, 2017, Glenn was discharged from physical therapy treatment because she failed to follow up after her last session.  (Tr. 828-29).  Glenn's last physical therapy session notes stated that she had achieved 80% improvement after 6 sessions.  (Tr. 827-28).

On January 8, 2018, Glenn returned to Dr. Knight, reporting that her orthopedist stated there was nothing more he could do for Glenn's shoulder.  (Tr. 896).  Glenn also reported back, hip, joint, knee, and neck pain, stiffness, and arthritis.  (Tr. 896, 898).  On physical examination,

Glenn had results similar to her November 10, 2017 visit except that she had impingement on both shoulders.  (Tr. 898-99).  MRI examination of Glenn's right shoulder showed moderate degenerative changes of the acromioclavicular joints and moderate tendinopathy of the supraspinatus tendon.  (Tr. 815).  Dr. Knight diagnosed Glenn with impingement syndrome in both shoulders, deteriorating type 2 diabetes with polyneuropathy, and osteoarthritis.  (Tr. 899).

On February 9, 2018, Glenn reported to Dr. Knight that she was doing exercises for her shoulders, back, and hips and that her hand was sore from hitting the fridge.  (Tr. 901).  She also reported fatigue and weakness.  (Tr. 902).  On physical examination, Glenn had results similar to her January 8, 2018 visit.  (Tr. 903).

On March 9, 2018, Glenn reported to Dr. Knight that she was told by her eye doctor she had cataract in her right eye.  (Tr. 906).  Glenn also reported fatigue and weakness.  (Tr. 907).  On physical examination, Glenn's results similar to her previous three visits expect she additionally had diminished sensation in her feet.  (Tr. 908).

On April 18, 2018, Glenn reported to Dr. Knight that her osteoarthritis and shoulder were "stable," but she had new onset of knee pain after bumping it in the car.  (Tr. 911).  Glenn also reported fatigue, weakness, and malaise.  (Tr. 912).  Glenn's physical examination results were similar to her previous visit, except that Dr. Knight did not assess the sensation of Glenn's feet.  (Tr. 913).  Dr Knight administered a Kenalog injection.  (Tr. 914).

On May 30, 2018, Glenn reported to Dr. Knight fatigue, weakness, malaise, shortness of breath with activity, arthritis, stiffness, muscle aches, and pain in her joints, back, neck, and shoulders.  (Tr. 916).  On June 29 and July 25, 2018, Glenn reported to Dr. Knight fatigue, weakness, and malaise.  (Tr. 920-21, 925-26).  Glenn's physical examination results at all these visits were similar to her April 18, 2018 visit.  (Tr. 918, 922, 927).

7

On August 21, 2018, Glenn called Dr. Knight's office and reported tingling and numbness in her back and that her legs gave out while she was walking. (Tr. 930). Glenn also reported noticing numbness in her left fingers and toes that spread to her entire left side as the day progressed. *Id.* At her August 24, 2018, visit with Dr. Knight, Glenn also reported fatigue, weakness, and malaise. (Tr. 931). On physical examination, Glenn appeared in moderate pain/distress and had: (i) diffuse arthritis with antalgic limp and "assist with walking"; (ii) impingement in both shoulders with limited range of motion; (iii) spasms in the lower spine; and (iv) weakness in her left foot. (Tr. 932). X-ray examination of Glenn's spine showed minimal degenerative changes. (Tr. 809). Dr. Knight diagnosed Glenn with degenerative disc disease. (Tr. 932).

On September 21, 2018, Glenn reported to Dr. Knight that she was "doing well and no complaints" but back pain and numbness. (Tr. 935-36, 938). She also reported fatigue, weakness, malaise, joint pain, stiffness, arthritis, and muscle aches. (Tr. 936). On physical examination, her results were similar to her previous visit. (Tr. 937).

Between November 28, 2018 and January 28, 2019, Glenn reported fatigue, weakness, and malaise. (Tr. 946, 951, 956). On November 28, 2018, she also reported back, joint, and knee pain as well as stiffness and arthritis. (Tr. 946). Her physical examination results for this period were similar to her August 24, 2018 visit. (Tr. 947, 952, 957).

On February 15, 2019, Glenn underwent x-ray examination of her lumbar spine, which showed unchanged minimal degeneration and no appreciable acute abnormality. (Tr. 798, 1107).

On March 6 2019, Glenn reported to Dr. Knight that she had fatigue, weakness, malaise, numbness/tingling, and imbalance. (Tr. 959-60). On physical examination, Glenn appeared in moderate pain/distress and had: (i) diffuse arthritis with antalgic limp and assist with walking;

(ii) bilateral shoulder impingement and limited range of motion; and (iii) spasms in her lower spine.  (Tr. 961).  Dr. Knight referred Glenn to a neurologist for an evaluation into her numbness.  (Tr. 962).

On April 3, 2019, Glenn reported to Dr. Knight only fatigue, weakness, and malaise.  (Tr. 967-68).  On physical examination, Glenn appeared in moderate pain/distress, had spasms in the lower spine, and had weakness in her left foot.  (Tr. 969).

On April 23, 2019, Glenn visited Brendan W. Bauer, MD, for a neurology consultation.  (Tr. 600).  Glenn reported intermittent numbness and tingling in her fingers, toes, and feet that began two years before and, more recently, that her left leg would give out.  *Id.*  Glenn also reported use of a cane; falling; imbalance and ambulation problems; occasional low back pain with numbness and weakness that radiated down to her legs; and burning sensation at night.  *Id.*  On physical examination, Glenn unremarkable results except 4/5 and -4/5 strength in some of her lower extremity muscles.  (Tr. 601).  Dr. Bauer assessed Glenn with neuropathy and cervical radiculopathy and ordered x-ray and EMG testing.  *Id.*

On April 26, 2019, Glenn underwent x-ray examination.  (Tr. 589, 591).  The x-ray revealed minimal degenerative spondylosis and facet osteoarthritis, which was "stable" from her previous x-ray examination.  (Tr. 591).  X-ray testing of her cervical spine showed mild degenerative spondylosis and facet osteoarthritis, which had slightly progressed from her previous exam.  (Tr. 589).

On May 2 and 3, 2019, Glenn underwent an EMG evaluation of the upper and lower extremities.  (Tr. 592-97).  Her upper extremity evaluation indicated findings consistent with: (i) bilateral remote C5/C6 motor radiculopathies that were mild/moderate in degree; and (ii) carpal tunnel syndrome that was minimal in degree.  (Tr. 594).  Her lower extremity

evaluation indicated findings consistent with bilateral L5 radiculopathies that were mild in degree on the right and moderate in degree on the left.  (Tr. 597).

On May 8, 2019, Glenn returned to Dr. Knight, reporting fatigue, weakness, malaise, stiffness, muscle aches, loss of strength, arthritis, joint pain, difficulty breathing, shortness of breath, and imbalance.  (Tr. 976-78).  On physical examination, Glenn had results similar to her April 3, 2019 visit.  (Tr. 978).

On May 13, 2019, Glenn visited Jacqueline Graziani, CNP, for a neurology follow-up. (Tr. 603).  Glenn reported back pain rated at 6/10 and neck pain rated at 8/10 and that she used her cane most of the time.  *Id.*  Glenn also reported that her pain worsened with prolonged walking and sitting and climbing stairs.  *Id.*  On physical examination, Glenn had results similar to her previous visit except that she had reduced sensation to vibration on the left side of her body.  (Tr. 605).  Nurse practitioner Graziani diagnosed Glenn with degenerative lumbar disc disease, bursitis on both hips, cervical and lumbar radiculopathy, carpal tunnel syndrome, and cervical spondylosis.  (Tr. 606).  Nurse Practitioner Graziani ordered a lumbar epidural injection, which was administered on June 10, 2019.  (Tr. 606, 613-14).

On June 12, 2019, Glenn visited Dr. Knight, reporting dull lower back pain and continued numbness in her lower extremities but no tingling.  (Tr. 981, 984).  She also reported fatigue, weakness, and malaise.  (Tr. 982).  Her physical examination results were similar to her May 8, 2019 visit.  (Tr. 983).

On July 17, 2019, Glenn reported to Dr. Knight daily tingling in her legs and headaches since her epidural injection.  (Tr. 986).  She also reported lower back pain, fatigue, malaise, weakness, joint pain, stiffness, muscle aches, arthritis, and shortness of breath.  (Tr. 987-88).

Her physical examination results were unchanged from her previous visit.  (Tr. 988).  Dr. Knight added a new diagnosis of chronic fatigue syndrome secondary to depression.  (Tr. 990).

On July 24, 2019, Glenn returned to Nurse Practitioner Graziani, stating that she only felt 50% relief from the epidural injection for two days.  (Tr. 615).  Glenn reported back pain rated at 6/10, left leg and arm numbness, hip pain, and tingling in her lower extremities.  *Id.*  She also stated that her back pain worsened with bending.  *Id.*  On physical examination, Glenn had: (i) 4-/5 and 4/5 strength in some of her lower extremities; (ii) reduced sensation to vibration on the left side of her body; and (iii) unstable gait.  (Tr. 617).  She was also observed to be ambulating with a cane.  *Id.*  Nurse Practitioner Graziani ordered an additional epidural injection, which was administered on August 19, 2019.  (Tr. 618, 621-22).

On August 14, 2019, Glenn visited Dr. Knight, reporting fatigue, weakness, malaise, and difficulty breathing.  (Tr. 991-92).  On physical examination, her results were similar to her previous visit.  (Tr. 993).

On September 11, 2019, Glenn reported to Dr. Knight back, neck, and joint pain subsequent to the epidural injection.  (Tr. 996).  She also reported fatigue, headaches, numbness from her fingers down her arm, imbalance and use of a cane to prevent falling, leg cramps, and vision problems.  *Id.*  Glenn reported that after exertion, she felt like she had just run a marathon. *Id.*  On physical examination, her physical examination results were unchanged to her last visit. (Tr. 998).

On October 16, 2019, Glenn reported to Dr. Knight fatigue, gait disorder, fine tremors, tenderness over trochanteric regions, and numbness in her hands and feet.  (Tr. 1001).  She also reported back and joint pain, muscle aches, stiffness, and shortness of breath.  (Tr. 1002-03).  On physical examination, Glenn's results were similar to her last visit.  (Tr. 1003).

November 11, 2019, Glenn returned to Nurse Practitioner Graziani, reporting that she got no relief from her epidural injection.  (Tr. 625).  She reported left arm numbness, back pain rated at 8/10, frequent back spasms, lower extremity numbness, and hip pain.  *Id.*  She reported that her neck pain was stable and that her hands were only occasionally numb.  *Id.*  And she reported that she used a cane to walk.  *Id.*  On physical examination, Glenn had unremarkable results except: (i) 4/5 lower extremity strength; (ii) reduced vibration sensation in the lower left extremity; and (iii) unstable gait.  (Tr. 627).  Nurse Practitioner Graziani stated that Glenn's carpal tunnel syndrome was stable, ordered another epidural injection, and ordered an MRI of Glenn's spine.  (Tr. 628).

On November 27, 2019, Glenn underwent an MRI examination, which showed L4-5 degenerative disc disease.  (Tr. 635, 744).  Specifically, the MRI showed moderate narrowing of the central canal and mild foraminal narrowing which was suspected to cause impingement or compression of the nerve roots.  *Id.*  On December 2, 2019, Glenn received an epidural injection. (Tr. 631-32).

On December 4, 2019, Glenn visited Dr. Knight, reporting fatigue, malaise, weakness, joint pain, muscle aches, back pain, neck pain, shoulder pain, knee pain, stiffness, and arthritis. (Tr. 1007).  On physical examination, Glenn had results similar to her October 16, 2019 visit. (Tr. 1008).

On January 15, 2020, Glenn reported to Dr. Knight fatigue, weakness, and malaise.  (Tr. 1012).  She also reported that she fell while getting into her camper.  *Id.*  On physical examination, Glenn appeared in moderate pain/distress and had: (i) diffuse arthritis with antalgic limp and assist with walking; (ii) shoulder impingement and limited range of motion;

(iii) kneecap laxity; (iv) diffuse arthritis in her shoulder and back; (v) spasms in her lower spine; and (vi) weakness in her left foot.  (Tr. 1013).

On February 12, 2020, Glenn reported to Dr. Knight fatigue, weakness, joint pain, stiffness, muscle aches, loss of strength, and back pain.  (Tr. 1016).  Her physical examination results were similar to her previous visit, except she also had a coarse tremor.  (Tr. 1017).

On February 21, 2020, Glenn visited Nurse Practitioner Graziani, reporting no relief from the epidural injection and pain rated at 8/10.  (Tr. 575).  On physical examination, Glenn's results were unremarkable.  (Tr. 575-76).  Nurse Practitioner Graziani referred Glenn to pain management for her back pain and recommended facet injection.  (Tr. 576-77).

On March 11, 2020, Glenn returned to Dr. Knight, reporting worsening neuropathy in her hands that was worsened with turning her head.  (Tr. 1020, 1023).  On physical examination, Glenn appeared in moderate pain/distress and she had: (i) diffuse arthritis with antalgic limp and assist with walking; (ii) shoulder impingement with limited range of motion; (iii) kneecap laxity; (iv) diffuse arthritis in her shoulder and back; and (iv) decreased sensation in both hands with weak grip.  (Tr. 1022).  Dr. Knight ordered a brain MRI.  (Tr. 1023).

On March 25, 2020, Glenn visited Steven McMurray, MPT, for a functional capacity evaluation.  (Tr. 720).  Glenn reported back and neck pain and left leg and right shoulder weakness.  *Id.*  She rated her pain between 4/10 and 7/10 and that she used an assistive device to walk.  *Id.*  Glenn further reported that she enjoyed gardening and knitting and maintained a sedentary level of activity.  (Tr. 726).  Upon physical examination: (i) Glenn's hand dexterity was in the first percentile group, but the test was terminated due to right hand numbness; (ii) Glenn's hand strength was weaker than the normative group; (iii) Glenn was unable to complete cardiovascular testing due to a high resting blood pressure; (iv) Glenn carried a box

13

weighing 10 pounds 14 feet, which was below average; (v) Glenn's overhead reach was within

normal limits; (vi) her reach behind her shoulder blade was painful (5/10); (vii) Glenn's active

shoulder range of motion was limited; (viii) Glenn's wrist range of motion was within functional

limitations; and (ix) Glenn's trunk rotation and bend was painful.  (Tr. 731-38).  Physical

Therapist McMurray observed that Glenn's performance varied during testing, namely, towards

then end with "visible shakiness in both left leg and right hand."  (Tr. 724).

### C.    Relevant Opinion Evidence

#### 1.    Treating Physician, Kim E. Knight, MD

On March 30, 2020, Dr. Knight completed a physical medical source statement with an

attached report.  (Tr. 435-40).  The medical source statement consisted of circled answers,

checked boxes, and fill-in-the-blank answers indicating that that Glenn: (i) could sit and stand no

more than 5 minutes at a time; (ii) could sit, stand, and walk for less than 2 hours in an 8-hour

workday; (iii) required unscheduled breaks more than 20 times in an 8-hour period, each lasting

10-15 minutes in length, because of muscle weakness, pain, and fatigue; (iv) needed to use a

cane or other hand-held assistive device because of her imbalance, pain, and weakness; (v) could

rarely lift 10 pounds; (vi) had significant limitations with reaching, handling, or fingering;

(vii) would likely be off task 25% of the time or more; and (viii) could not tolerate even low

stress work.  (Tr. 436-38).  Regarding her upper extremity limitations, Dr. Knight specified that

Glenn could only twist objects 10% of the time, manipulate objects 0% of the time, forward

reach 10% of the time, and reach overhead 0% of the time.  (Tr. 437).

In the supporting report, Dr. Knight listed Glenn's diagnoses, symptoms, and treatment,

as well as his objective findings.  (Tr. 439-40).  Dr. Glenn's objective findings were: (i) Glenn

usually presented positive for moderate pain; (ii) Glenn walked with an antalgic limp and used a

cane; (iii) Glenn had decreased grip strength and sensation; (iv) Glenn had crepitus in her shoulders and impingement syndrome; (v) Glenn had occasional fine tremors in her hands; and (vi) Glenn had spasms and point tenderness in her lumbosacral muscles.  (Tr. 439-40).

### 2.    Consultative Examiner, Steve McMurray, PT

Physical Therapist McMurray opined that Glenn was unable to return to work due to her low tolerance to stooped postures, left leg radicular symptoms, and low dexterity skills.  (Tr. 724).  Physical Therapist McMurray further opined that Glenn was limited to sedentary work that allowed for sitting at least 66% of the time.  *Id.*

### 3.    Consultative Examiner, Marsha D. Cooper, MD

On April 23, 2019, Marsha D. Cooper, MD, evaluated Glenn for disability.  (Tr. 399). Glenn denied pulmonary, cardiovascular, neurologic, or musculoskeletal symptoms.  (Tr. 399-400).  On physical examination, Glenn had unremarkable results except a small mid ventral hernia.  (Tr. 395-98, 400-01).  Dr. Cooper noted that Glenn appeared at the evaluation with a cane that did not "appear necessary" and was "somewhat melodramatic to histrionic at times." (Tr. 400).

### D.    Function Report

On April 1, 2019, Glenn completed a function report, in which she stated her degenerative disc disease made prolonged standing/sitting difficult.  (Tr. 267).  Glenn stated that her daily routine consisted of taking her children to and from school and appointments and preparing dinner.  (Tr. 268).  She also reported caring for two dogs and two cats, which she fed and let outside.  *Id.*  She also received assistance from her mother-in-law, husband, and children. *Id.*

15

Glenn stated that she was able to complete meals but only a few days per week and she often needed assistance. (Tr. 269). She stated that she was able to garden, dust, clean dishes, and do laundry with the assistance of her mother-in-law. *Id.* Glenn stated she was able to get around by walking, driving, and riding in a car. (Tr. 270). She shopped for groceries twice per month. *Id.*

Glenn stated that her hobbies included cross-stitching, painting, drawing, television, woodworking, cooking, and movies, though she did not do them frequently because of her pain and tiredness. (Tr. 271). Glenn stated that she attended a monthly cookbook club and visited the library weekly. *Id.* Glenn further stated that she could walk up to 20 minutes before needing to rest and used a cane whenever she left the house. (Tr. 272-73). She also indicated that her impairments limited her ability to lift, squat, bend, stand, walk, sit, kneel, climb stairs, and use her hands. (Tr. 272).

### E.   Relevant Testimonial Evidence

Glenn testified at the ALJ hearing that she lived in a camper with her husband, 16-year-old son, and mother-in-law. (Tr. 71, 73, 77, 80). She did laundry offsite at a laundromat, though she testified both that her husband dropped her off to do it and that she received assistance from family to do laundry. (Tr. 72, 107). She showered every other day at her son's house. (Tr. 90). She had difficulty standing to take a shower, which usually took her 45 minutes to do. (Tr. 105). She also needed assistance to shower because she could not reach behind her back. (Tr. 91). She testified that she used a cane to walk and prevent from falling over but she did not have a prescription for it. (Tr. 91-92). Glenn testified that she dropped things because of tingling and numbness in her fingers. (Tr. 104). For example, the morning of the hearing she dropped her

hairbrush five times and she occasionally dropped her clothes while getting dressed.  (Tr. 104-05).  And there were days that she did not want to move out of bed.  (Tr. 102).

Glenn testified that a typical day consisted of doing dishes in the morning and talking with her mother-in-law.  (Tr. 88-89).  She had two small dogs weighing five and ten pounds.  (Tr. 89).  Before the pandemic, she attended monthly cookbook club meetings at the library and baked for the meetings.  (Tr. 96-97).

Glenn testified that since the prior ALJ decision, her greatest issue was widespread pain, mostly in her joints.  (Tr. 80, 82).  As recently as April 2020, she had an incident in which her left side stopped working and another incident in which she blacked out while driving.  (Tr. 85, 93).  Glenn also testified that her physical evaluation with Physical Therapist McMurray seemed like "child's play," in that it "was easy" but it wore her out the next day.  (Tr. 101).  Glenn testified that she wrote her function report before she developed back problems.  (Tr. 85).  At that time, she drove ten minutes to take her children to school and attended meetings occasionally.  (Tr. 84, 87).

## III.  Law & Analysis

### A.  Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And, even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"

*O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Jones*, 336 F.3d at 477); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (Substantial evidence "means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'").  But, even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

## B.    Step Four Opinion Evidence

Glenn argues that the ALJ failed to apply proper legal standards in his evaluation of Dr. Knight's opinion.  ECF Doc. 16 at 13-17.  Specifically, Glenn argues that the ALJ failed to give an adequate explanation for why he discounted the limitations espoused in Dr. Knight's opinion, focusing instead on Glenn's upper and lower extremity limitations.  ECF Doc. 16 at 14-17.  Glenn also argues that the ALJ's analysis failed to address medical records that were consistent with Dr. Knight's opinion, such as Dr. Knight's objective exam findings between August 2017 and March 2020.  ECF Doc. 16 at 16-17.  And Glenn argues the error was harmful

because Dr. Knight's opinion limiting her to sitting, standing, or walking less than two hours per day would fall below the sedentary level of exertion. ECF Doc. 16 at 17.

In her response brief, the Commissioner reads Glenn's argument as contesting the ALJ's evaluation of Glenn's subjective symptom complaints as well as the opinion evidence. ECF Doc. 17 at 9-18. As to the former issue, the Commissioner argues the ALJ appropriately discounted Glenn's subjective symptom complaints and reached an RFC that was supported by substantial evidence. ECF Doc. 17 at 10-15. As to the latter issue, the Commission argues that the ALJ adequately explained why he found Dr. Knight's opinion was unsupported when he noted that Dr. Knight's examinations did not show findings associated with disabling musculoskeletal impairments. ECF Doc. 17 at 16-17. The Commissioner argues that the ALJ appropriately found the opinion inconsistent when he stated that Glenn's records did not support a finding that she was completely disabled and elsewhere in his decision cited evidence that would support that conclusion. ECF Doc. 17 at 17-18.

In her reply brief, Glenn reaffirms her argument that the ALJ erred in his evaluation of Dr. Knight's opinion by ignoring Dr. Knight's corroborative exam findings. ECF Doc. 18 at 2-3.

At Step Four of the sequential evaluation process, the ALJ must determine a claimant's RFC after considering all the medical and other evidence in the record. 20 C.F.R. § 416.920(e). In doing so, the ALJ is required to "articulate how [he] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 416.920c(a). At a minimum, the ALJ must explain how he considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 416.920c(b)(2).[5] According to

---

[5] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 416.920c(c)(3)-(5).

the regulation, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be.  This is the consistency standard.  And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be.  This is the supportability standard.  *See* 20 C.F.R. § 416.920c(c)(1)-(2).

The ALJ failed to apply proper legal standards in finding Dr. Knight's opinion unpersuasive.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  As a threshold matter, however, the court notes that, contrary to the Commissioner, it does not read Glenn's brief to raise a challenge to the ALJ's RFC findings that is separate and distinct from her challenge to the ALJ's consideration of Dr. Knight's opinion.  Thus, the court will not consider or address the ALJ's evaluation of Glenn's subjective symptom complaints.[6]  *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997).

Moving to the merits, at face value, the ALJ's analysis would appear to comply with the regulations.  In reaching that finding, the ALJ stated:

> The extreme limitation to which Dr. Knight opines is not supported by the record as a whole.  Although [Glenn] has presented to appointments with a cane and alleges the need for a cane, the objective examination findings do not support the need for a cane, as discussed in detail above.  As noted by the consultative psychologist, although [Glenn] presented with a cane to that appointment, it did not appear needed (Ex. D3F).  Although Dr. Knight's examination findings often note an antalgic gait and use of a cane, there are no corresponding objective findings such as a positive straight leg raise, demonstration of weakness in the lower extremities or other findings that support these limitations.  Further, these limitations are inconsistent with [Glenn's] report of regular activities to include visiting the library, attending school appointments, attending doctor's

---

[6] To the extent that the Commissioner means to argue that this court should affirm the ALJ's decision because substantial evidence supported his overall RFC determination, the Sixth Circuit has stated that "we must reverse and remand if the ALJ applied incorrect legal standards, even if the factual determinations are otherwise supported by substantial evidence and the outcome on remand is unlikely to be different."  *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 859 (6th Cir. 2011).

appointments with her son, cooking, and showering.  With respect to the opinion that she could sit for no more than five minutes at a time, [Glenn] testified at hearing [*sic.*] that she and her mother-in-law could sit at the table talking for hours at a time (Hrg. Tr.).  Accordingly, this opinion is not found to be persuasive.

(Tr. 32).[7]  The ALJ expressly considered the supportability of Dr. Knight's opinion when he found that there were no objecting findings regarding Glenn's lower extremities to support the need to use a cane or objecting findings generally to support the severity of his stated limitations. *Id.*  And the ALJ expressly considered consistency of Dr. Knight's opinion when he found it unsupported by the record as a whole, and other treating sources commented that the use of a cane was not necessary, and Glenn's reported activities were inconsistent with the degree of limitation Dr. Knight assessed in his opinion.  *Id.*  Thus, the ALJ's opinion complied with the regulatory requirement that he consider the consistency and supportability of Dr. Knight's opinion.  20 C.F.R. § 416.920c(b)(2).

The ALJ also provided sufficiently clear and adequately supported reasons for discounting *some* of the limitations in Dr. Knight's opinion.  Regarding the need to use a cane, the ALJ reverse-incorporated his discussion of the evidence as documenting exam findings inconsistent with the need to use a cane, highlighting Dr. Knight's lack of corroborating objective exam findings and Dr. Cooper's inconsistent opinion.  Reading the ALJ's decision as a whole, we can discern which objective examinations the ALJ believed were inconsistent with the need to use a cane.  *Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010).  Those included: (i) Glenn's unremarkable physical examination results at Dr. Cooper's consultative examination, including normal gait, balance, and clearance, no edema, and a negative straight leg raise test; (ii) Dr. Bauer's objective exam findings, including normal gait

---

[7] Although the ALJ makes mention of a "consultative psychologist," the appointment to which he referred was Glenn's consultative physical examination by Dr. Cooper.

and station; and (iii) Nurse Practitioner Graziani's objective exam findings, including normal gait and station.  (Tr. 25-26).

The same is not true, however, regarding Dr. Knight's objective exam findings, which, as of March 2019 onwards, repeatedly documented left foot weakness.  (Tr. 969, 978, 983, 988, 993, 998, 1003, 1008, 1017, 1031).  The activities of daily living the ALJ noted were also not inconsistent with the need to use a cane.  Nevertheless, the ALJ's finding that the use of the cane was inconsistent with the evidence from other medical sources was supported by substantial evidence and could alone sustain his rejection of that portion of Dr. Knight's opinion.  *See Richardson v. Saul*, No. 20-cv-489, 2021 U.S. Dist. LEXIS 161602, at *29 (D. N.H. Aug. 26, 2021) (noting that a persuasiveness finding based solely on consistency grounds would have been sufficient for the ALJ to find a medical source's opinion less persuasive).  And as the ALJ correctly observed elsewhere in his opinion, Glenn testified that she was never prescribed a cane and Dr. Cooper observed that it did not appear necessary.  (Tr. 92); *see* SSR 96-9p, 1996 SSR LEXIS 6, at *10-11 (July 2, 1996) ("To find that a hand-held assistive is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed."); *Krieger v. Comm'r of Soc. Sec.*, No. 2:18-cv-876, 2019 U.S. Dist. LEXIS 142877, at *11 (S.D. Ohio Aug. 22, 2019) ("Medical necessity requires more than just the claimant's subjective desire to use the cane.").  The ALJ's consistency finding could also more generally have served as adequate support for the ALJ's reasons for finding unpersuasive Dr. Knight's opinion on Glenn's lower extremity limitations.

The ALJ could properly discount Dr. Knight's opinion regarding Glenn's need to sit for no more than five minutes at time as inconsistent with Glenn's own testimony that "me and my

mother-in-law will sit across from each other and talk for hours."  (Tr. 88); *see Richardson*, No. 20-cv-489, 2021 U.S. Dist. LEXIS 161602, at *29.  It would also be inconsistent with the evidence the ALJ incorporated by way of reference, such as: (i) imaging tests documenting mild to moderate degenerative disc changes, central canal and foraminal narrowing, and osteoarthritis; and (ii) unremarkable objective exam findings in Dr. Bauer's, Nurse Practitioner Graziani's, and Dr. Cooper's physical examinations.  (Tr. 25-26).  And the ALJ could properly have discounted Glenn's reported inability to stand for more than 5 minutes at a time, in addition to the above-discussed unremarkable exam findings, based on her testimony that she could stand to shower for 45 minutes.  (Tr. 105).

The ALJ's explanation is wanting, however, with respect to Dr. Knight's opinion regarding Glenn's ability to (i) lift weight; (ii) manipulate; and (iii) reach.[8]  The ALJ did not expressly state the basis for why he found Dr. Knight's opinion on these limitations unpersuasive, focusing instead, almost exclusively, on Glenn's lower extremity limitations.  *See* (Tr. 28).  The only portions of the ALJ's analysis that could be read as pertaining to Dr. Knight's other assessed limitations would be his blanket assertion that they were "not supported by the record as a whole;" Dr. Knight's treatment notes lacked corroborative objective findings; and they were inconsistent with Glenn's ability to go to the library, attend school and doctors' appointments, cook, and shower.

The ALJ's first reason for discounting Dr. Knight's opinion on Glenn's upper extremity limitations fails to build an accurate and logical bridge between the evidence and the result. *Fleischer*, 774 F. Supp. 2d at 877.  The second reason arguably points the court in the right

---

[8] As Glenn does not argue that the ALJ should have credited the portion of Dr. Knight's opinion regarding Glenn's need to take breaks 20 times in an 8-hour period or need to remain off-task more than 25% of the time, the court does not express itself on whether the ALJ erred with respect to that portion of the opinion.  *See McPherson*, 125 F.3d at 995-96.

direction, except that the ALJ's discussion of Dr. Knight's treatment notes includes findings documenting: (i) diffuse arthritis; (ii) shoulder impingement; (iii) limited shoulder range of motion; and (iv) decreased sensation and grip in her hands.  (Tr. 25-26).  And the third reason lacks logical coherence.  It does not necessarily follow that being able to attend doctors' appointments or visit the library once per week is inconsistent with a decreased ability to lift, manipulate, or reach.  (Tr. 95, 272).  The court also fails to see how being able to prepare a meal in 30 minutes, "often" with assistance, is also inconsistent with these limitations, especially given that Glenn testified that: (i) her hand numbness caused her to drop things while cooking and dressing; (ii) she and her mother-in-law took turns preparing meals and mostly prepared "small" meals; (iii) the school provided accommodations to expedite her son's appointments; (iv) and she showered every other day and sometimes once per week.  (Tr. 84, 86-87, 90, 105, 269).

The ALJ's lack of meaningful explanation for why he found unpersuasive Dr. Knight's opinion on Glenn's upper extremity limitations constitutes a failure on the part of the ALJ to articulate how he considered the consistency and supportability of Dr. Knight's opinion on these limitations in terms sufficient to allow for meaningful review.  20 C.F.R. § 416.920c(b); *see also* SSR 98-6, 1996 SSR LEXIS 5, at *20 (July 2, 1996) ("If the RFC assessment conflicts with an opinion from a medical source, the [ALJ] must explain why the opinion was not adopted").  The Commissioner invites the court to look at evidence the Commissioner contends was inconsistent with Dr. Knight's opinion which the ALJ cited elsewhere in his decision.  But the Commissioner's argument amounts to an improper after-the-fact attempt to give the reasons the ALJ failed to provide.  *Berryhill v. Shalala*, 4 F.3d 993, at *6 [published in full-text format at 1993 U.S. App. LEXIS 23975] (6th Cir. Sept. 16, 1993) (unpublished) ("[T] courts may not

24

accept appellate counsel's *post hoc* rationalizations for agency action." (quotation marks omitted)).

Nevertheless, the court finds that the ALJ's articulation error was harmless. *Rabbers v. Comm'r of Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009). An error in the ALJ's evaluation of the opinion evidence may be harmless in one of three circumstances: (i) when the opinion was "so patently deficient that the Commissioner could not possibly credit it"; (ii) when the Commissioner made findings consistent with the opinion; or (iii) the Commissioner otherwise met the goals of the regulations by attacking the supportability or consistency of the opinion. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 440 (6th Cir. 2010).[9]

The first and second circumstances do not apply. Opinions that consist merely of checked boxes with no explanations beyond diagnoses for support have been held to be patently deficient. *Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474-75 (6th Cir. 2016). Although, Dr. Knight's the limitations in Dr. Knight's opinion are expressed in terms of checked boxes and circled answers, Dr. Knight attached a report with a list of symptoms and objective findings which would appear to corroborate at least some degree of limitation in Glenn's ability to lift, carry, reach, handle, or finger. (Tr. 437-40). The second circumstance is not present because the ALJ did not assess limitations to Glenn's ability to lift, carry, or reach and the ALJ found that Glenn could frequently handle and finger (as opposed to 0% or 10% of the time). (Tr. 22).

---

[9] Although the harmless-error analysis articulated in *Wilson* concerned the pre-March 27, 2017 regulations, district courts within this circuit have applied that analysis to the post-March 27, 2017 regulations. *See Hickman v. Comm'r of Soc. Sec.*, No. 2:20-cv-6030, 2021 U.S. Dist. LEXIS 215187, at *14 n.5 (S.D. Ohio Nov. 8, 2021); *Vaughn v. Comm'r of Soc. Sec.*, No. 20-cv-1119, 2021 U.S. Dist. LEXIS 134907, at *33 n.8 (W.D. Tenn. July 20, 2021); *Burba Comm'r of Soc. Sec.*, No. 1:19-CV-905, 2020 U.S. Dist. LEXIS 179252, at *12 (N.D. Ohio Sept. 29, 2020).

The third circumstance, however, *is* present.  "The procedural protections at the heart of the [regulations] may be met when the 'supportability' of a doctor's opinion, or its consistency with other evidence in the record, is *indirectly* attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments."  *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010) (emphasis in original).  The ALJ's analysis of Glenn's subjective symptom complaints was more an extensive summary of the record evidence during the period under adjudication than an explanation specifically describing which of Glenn's subjective pain symptoms was being discounted and why.  *See* (Tr. 24-27).  But the evidence discussed therein included evidence that would be inconsistent with the severity of the upper extremity limitations assessed in Dr. Knight's opinion.  Dr. Knight's opinion that Glenn would not be able to handle, finger or reach more than 10% of the time, or rarely lift 10 pounds and never lift 20 pounds was inconsistent with: (i) Dr. Cooper's objective findings that (a) Glenn's grasp, manipulation, pinch, and fine coordination were normal, (b) Glenn had no muscle atrophy, (c) and Glenn had full range of motion (Tr. 395-97) (ii) Dr. Bauer's motor exam findings of normal grip and upper extremity strength and intact sensation to vibration but reduced sensation to light touch (Tr. 601); (iii) Nurse Practitioner Graziani's objective findings through February 2020 of normal grip and upper extremity strength and intact light and vibratory sensation (Tr. 576, 605, 617, 627); and (iv) Glenn's testimony that she found Physical Therapist McMurray's physical evaluation to be "child's play," corroborating Physical Therapist McMurray's statement that Glenn did not give full effort (Tr. 101, 724).  Therefore, any error in the ALJ's analysis of Dr. Knight's opinion was harmless.

Thus, the court finds no basis for remand on account of Glenn's challenge to the ALJ's evaluation of the opinion evidence.

**IV.     Conclusion**

Because any error the ALJ may have made in his analysis of the opinion evidence was harmless, the Commissioner's final decision denying Glenn's application for SSI is affirmed.

**IT IS SO ORDERED.**

Dated: May 19, 2022

Thomas M. Parker
United States Magistrate Judge